Court. My name is Gary Dickey from Dickey and Campbell law firm in Des Moines, Iowa. Thank you for taking this case under the Criminal Justice Act. We appreciate it. Thank you for the appointment. Our pleasure. I appear today on behalf of Michael Allison, who asked this court to reverse the district court's restitution order in this case. As this court has noted on multiple occasions, the Mandatory Victims Restitution Act provides a remedy that's intended to compensate a victim for actual losses incurred as a result of a defendant's criminal activity. The purpose of the MVRA is therefore to make a victim whole for their losses. On the other side of the coin, it's important that this court is recognized on at least one occasion what the MVRA is not intended for. And that is, it's not intended to be a vehicle to disgorge a defendant of ill-gotten gains. This case concerns the amount of restitution owed to Airgas as a result of Mr. Allison's fraudulently inflated expense reimbursement claims. There is no dispute that Mr. Allison had vested options from Airgas over the period of his employment in the amount of approximately $735,000. But they were vested in the sense that they could also be divested if he was terminated for misconduct, right? Correct. And so why doesn't that, which is part of the agreement, and he was terminated for misconduct, why doesn't that make those valueless at that instant? They're valueless to Mr. Allison in that instance, and we don't dispute that, but they're not valueless to Airgas. And that's not in dispute. They had a book value, a real value in the amount of $735,000. And so I guess to your point, what the MVRA focuses on is the loss to the victim, not the actus reus of the defendant. And so if you focus on the loss to Airgas, there really isn't one in this case because those stock options had a real value, both a book value and an actual pecuniary value, which they got to retain as a direct result of Mr. Allison's conduct. And so he was vested in the sense that they had a contractual obligation. And so that's the central flaw of the district court's ruling. Counsel, if he had misconduct for reasons other than those related to the criminal activity, those stock options could be canceled, correct? Yes. The restitution is only related to his misconduct. Correct. Which would be exactly our precise point. So if the options were forfeited for reasons other than his fraud in this case, then it would fall within the Cupid decision that both the district court and the government has cited in this case. In other words, they would have received compensation or the value of the options wholly unrelated to the fraud. And that's not what we have here. And that goes to the central flaw of the district court's ruling, which is found on page 16 of the addendum. The district court makes a finding that the stock options, he was never entitled to the stock options is what the district court says because of the fraud. And that's simply demonstrably false. The options were awarded as part of a contractual employee incentive plan for qualifying employees. And there's no dispute, he was a qualifying employee. And there's no allegation that he committed any fraud in inducing those options. They were contractually obligated to pay those. Now, were those that the value to $735,000 or some amount, was that a describe the nature of that as an asset and on whose books it appeared? So that's described in better detail by the testimony from Mr. Allison himself, as he explains, over a period of certain years, as he hit certain milestones, he would be vested. In other words, the company would have a liability. And then they would report that as taxable income to the Internal Revenue Service of some kind, or he would have had he exercised the options. So they're vested, but it's not a realizable gain to him until he actually exercises the options. And in fact, I think he testified. So it's not actually his asset until he actually acquires them. Exercises the option. Yeah. I don't know for IRS purposes, but certainly in terms of an intangible asset. If he were putting together his net worth, would they be included as an asset? Prior to the fraud, yes. I mean, the whole purpose of this was that this was his nest egg for retirement. And there's no dispute, had he gone in January 31st prior to his termination, he could have signed the paperwork and they would have had to have cut him a check for $735,000. I don't think it's quite that simple, is it? I mean, doesn't he have to put up some money to buy the shares at a particular price? No, he doesn't. I mean, these are options under the 2006 equity incentive plan. The difference between what he would have had to have purchased and what they're worth, it's called an SRA, and that's a stock appreciation rate, I think is what they're referred to. There's no dispute that the actual spread between what the cost of the shares and what he could have exercised them for was $731,000. So in other words, as soon as he exercises them, they cut him a check for $731,000. And even David Cohn, the VP of auditing, conceded that in the sentencing on cross-examination. So what they would do is immediately write him a check for the difference, not have him put up some money and they give him stock? Correct. Yeah. So you don't go through the mechanics of, I purchase it and then I turn around and sell it on the open market. He's entitled to the spread, which in this case was valued at $731,000, which Airgas got to retain as a result of terminating him, directly resulting from the fraudulent conduct that he engaged in. And so it's important to understand the fraud that he engaged in here is unrelated to the vesting of the options, but has everything to do with the termination of the options, which is why the district court was incorrect. Isn't the amount he'd entitled to be tied to the stock price? It is. Yes. And if the stock price fell below the strike price, wouldn't they be valueless? Correct. Yes. There's no dispute on that. And I don't think the government or Airgas argued that they were valueless. So getting back, I think to Judge Smith's point, does he really have an asset until he actually exercises the options? Yes, he does in the sense that- He might have a contingent asset, but he doesn't have an asset until he exercises them. It's a form of deferred compensation. And so it's just like a 401k. I don't have it until I actually exercise it. Right. I mean, when he goes to exercise it, the stock price might be below the strike price, in which case it's valueless and he wouldn't exercise it. Right. And if that were the case, then Airgas would be entitled to the $560,000 in restitution. That's not the case. In this case, at the time that they were terminated, they were worth $731,000. And there's no meaningful dispute in the record on that. Even Airgas and the government concede that. The only question is, is that entitled to an offset? I mean, this isn't a situation like the Robur's decision from the Supreme Court, where you have a delay between when the property is returned and then when it's actually sold and who bears the risk between that delay. This was a situation that as of his termination. What's wrong with the district court's logic that his misconduct, the company could have, if they had been aware of what he was doing, they would have canceled these well in advance of any criminal action? And that this is really not a boon to the company? Again, the problem with that is it focuses on his conduct as opposed to the loss of the victim, which is what the MVRA is designed to take into consideration. I mean, the same argument could be made then with respect to a salary. He should owe them for his past salary that they paid him. But they're not being made whole by exercising a disciplinary action against a misbehaving employee who may have subsequently discovered that they've been defrauded in the hundreds of thousands of dollars. I guess I just disagree. I mean, the purpose of the misconduct clause is to ensure against these types of things, so that if you commit fraud, then we won't be left holding the bag of giving you $600,000 or $730,000 and you owing us $560,000. But they've been more than made whole. I mean, it's kind of a perverse situation where had he not committed the fraud, they would owe him $731,000 and likely that would go up over time. But as a direct result of the fraud, he owes them to the good after they terminated it. And I see my time has expired. If I can ask one more, if you don't mind. Let me posit a slightly different hypothetical and see what you think of that. Let's say he's got a one-year contract for a million dollar salary. And a month into it, he gets terminated for a cause because of this fraud. Arguably, they'd have to pay him the remaining amount of that, but for the fact that they were to terminate him for a cause, which is in the contract, would you be arguing that he'd be entitled to an offset for the remainder of his 11-month salary? No, I wouldn't because the remainder 11-month salary would not be vested at that time. So that's the difference. If this were a situation where he fraudulently obtained the option, so for example, if he had to have an $1 million and he inflated the books to show a million and one and he otherwise wouldn't have, we would not be asking for the offset because they'd be fraudulently obtained. Ms. Shirley. Good morning. May it please the court, counsel. The defendant claims that the victim is receiving a windfall or actually profited by virtue of the district court's restitution order in this case. But under the defendant's theory, it's actually the defendant who could receive a potential windfall. Not only did the defendant profit from his employer through his theft, he purchased family vacations, country club privileges, meals, and paid other personal expenses. The defendant is essentially asking this court to find that he should be re-awarded his stock options that were absolutely correctly terminated due to his misconduct. The district court did not commit clear error in this case in rejecting the defendant's argument. The defendant didn't meet his burden in finding that his restitution should be offset by the cost of these stock options. Is that a clear error review? It's clear error for the, in determining whether or not restitution should be issued is an abuse, but in determining the facts and the amount of the restitution, it's a clear error standard of review. Well, isn't whether he's entitled to an offset, isn't that more of a legal question than a fact question? Yes, your honor. And as a legal question, we'd review that de novo, right? Yes, your honor. Okay, so not clear error. But as to the amount that we're talking about today that's owed, that is a clear error standard. Well, that would be just calculating numbers as to... Correct. If he, if we were to conclude that he was entitled to it, we'd have to try to figure out what the numbers would be. Correct. That doesn't seem to be what we're really talking about here today. We're talking about the offset. You're correct, your honor. The defendant's position that the victim actually profited from the defendant's fraud flies in the the spirit of the Mandatory Victim Restitution Act. Following the discovery of the defendant's nearly 10-year theft from the company of hundreds of thousands of dollars, Airgas terminated the defendant's stock options for misconduct. The defendant does not contest the termination of these stock options. The district court found that the stock options were terminated and nothing was offset by the victim's failure to pay the defendant money it didn't owe him. The district court also noted that if the victim had known of Mr. Allison's misconduct, the theft that had started in 2003, he wouldn't have ever been paid on the stock options he exercised in 2008 to purchase a vacation home, and he never would have earned the stock options at issue here. What if he would have exercised the options before all this came out? Would he have been required to pay it back? I don't believe so, your honor, and I don't believe that the company is asking him to pay back the stock options that he exercised in 2008 to purchase the vacation home. Technically, maybe under a contract theory, the company could come back, but that's not the issue here. The issue here is that while the stock options were vested, they were never exercised. There's no value, as Judge Smith, you pointed out, what's the asset. It's a potential. It's an option at this point, and it is speculative based on the market value of those options. The options were contingent on the defendant following the stock option agreement, which included good employee behavior, and there's absolutely no dispute that Airgas was entitled to terminate the defendant's stock options. The district court also did not commit clear error in this case in determining that the stock option claim was so completely unrelated to Mr. Allison's theft, and therefore, the forfeited stock option wouldn't affect the restitution amount. The court referenced the Cupid case. That's where the court found that a defendant had a personal loan with a company he had embezzled from, and also civil judgment against that company. The court found that these two items are so unrelated to the defendant's fraud, so restitution would not be offset by those amounts. This is a similar case. The stock options are absolutely unrelated to the fraud. Yes, they were terminated because of Mr. Allison's misconduct, but Judge Smith, as you pointed out, in the stock option agreement, they could have been terminated for any number of reasons under the stock option policy. It wasn't just misconduct. Mr. Allison's theft was related to the expense reports, the fake expense reports that spanned over nearly 10 years. The stock options are a completely separate contract with Airgas. The defendant also claims, in addition to the $62,222, the district court already reduced the restitution by, he's entitled to another $5,200 reduction in restitution. The government and the defendant were in agreement at the hearing that the defendant was owed $5,200 to be reimbursed by the company for legitimate expenses, and the court heard testimony to this effect. In the order, the district court gave the defendant a more than generous 10% reduction across the board, which resulted in approximately $62,000 credit against what the victim requested, and this $5,200 was subsumed by that amount. The district court was obligated to estimate a reasonable amount of loss, and because of the defendant's actions, that was really hard to do. It was nearly 10 years of fake documents, ledgers, and the victim having to go through line by line of all of these expenses to determine which were legitimate and which were not. So the court reasonably took 10% across the board from the amount the victim was requesting, and the district court found that that more than adequately gave Mr. Allison any credit to which he was entitled. The court's conclusion in this case was not clearly erroneous, and if the panel doesn't have any additional questions- Is the stock option agreement in the record? It is, Your Honor. I guess we're satisfied. If I can, one more. Does the stock option agreement say that the company can terminate the option if there's misconduct? How is that phrased, if you know? I believe that there's a specific clause in the stock option agreement which says if there is misconduct, it's defined in the agreement, including theft, embezzlement, things of that sort, that the options can be terminated, and that the options shall terminate immediately and cease to be outstanding. I believe that's the direct language in the stock option agreement that Mr. Allison had with Airgas. And what point did they do that, do you know? At the time of his indictment, or before, or after? I believe that his stock options were terminated- Mr. Allison was terminated on February 19, 2013, and I believe that an independent committee met in April of 2013 and terminated his stock options after Mr. Allison was given an opportunity to present his side of the story. Was that before or after he was indicted and convicted? I believe it was before, Your Honor. Seeing no more questions, the government rests on its brief, and I thank you for your time. Mr. Dickey used up all his time. We'll give you one minute. You may please report. Judge Smith, to follow up on our previous discussion, on page 38 of the sentencing transcript, it explains that had Mr. Allison went in on February 18th, the day before the cancellation of his stocks, Airgas would have been obligated to pay him approximately $730,000, and that was admitted by the VP of Auditing, Dave Coyne. With respect to the plan, that's Exhibit C in the record, and the letter terminating the options is Exhibit V in the sentencing record, it's important that Dave Coyne testify that what happens is there's a compensatory grievance or governance committee that decides whether or not to terminate, and they visited, decided that misconduct had occurred, and then terminated the option. So we would take the position that they're avoidable, but not necessarily void in and of themselves by virtue of conduct, because it requires the governance committee activity. And so for those reasons, we would ask that you reverse the district court's restitution order.